No. 114,894

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOSE ALBERTO GONZALEZ-SANDOVAL,
*Appellant*.

SYLLABUS BY THE COURT

1.

The use of a peremptory strike to remove venire members solely because of their race or ethnicity violates the Equal Protection Clause of the United States Constitution.

2.

The *Batson* analysis is composed of three steps: (1) the defendant must make a prima facie showing that a peremptory challenge has been exercised based on race or ethnicity; (2) if the defendant makes this showing, the State must offer a race-neutral reason for striking the minority venire member in question; and (3) in light of the defendant's and the State's submissions, the trial court must determine whether the defendant has shown that the State's stated reason is pretextual.

3.

When illegitimate grounds like race or ethnicity are in issue, the State must stand or fall on the initial reason or reasons it provided to the trial court for striking a minority venire member.

1

4.

A trial court is required to limit its inquiry to the reason originally offered by the State during voir dire for its peremptory strike of a minority venire member. Thus, if the State later attempts to offer a substitute reason or another reason for striking the minority venire member, the trial court is barred from considering the substitute reason or another reason for striking the minority venire member.

5.

Under K.S.A. 2015 Supp. 60-455(d), evidence of alleged prior sexual misconduct is admissible to show the defendant's propensity to commit the crime charged. The probative value of alleged prior sexual misconduct evidence is admissible so long as it outweighs the prejudicial value of the alleged prior sexual misconduct evidence. Probativity is often determined by comparing the circumstances surrounding the alleged prior sexual misconduct to the crime charged.

6.

Alleged prior sexual misconduct evidence is inadmissible to establish absence of mistake unless the defendant has actually argued that he or she committed the crime charged by mistake.

7.

When reviewing sufficiency of the evidence, appellate courts will uphold a defendant's conviction if a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts must view all the evidence in the light most favorable to the State, and appellate courts must not reweigh the evidence or the credibility of witnesses.

Appeal from Lyon District Court; MERLIN G. WHEELER, judge. Opinion filed February 10, 2017. Reversed and remanded with directions.

2

*Christopher S. O'Hara*, of O'Hara & O'Hara, LLC, of Wichita, for appellant.

*Laura L. Miser*, assistant county attorney, *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, C.J., GREEN and LEBEN, JJ.

GREEN, J.: Following a jury trial, Jose Alberto Gonzalez-Sandoval was convicted of aggravated indecent liberties with a child. On direct appeal, Gonzalez-Sandoval argues that he is entitled to reversal of his conviction and a new trial for the following reasons: (1) the trial court erred when ruling on his *Batson* challenge; (2) the trial court erred when denying his motion for new trial based on newly discovered evidence; (3) the trial court erred when it allowed the victim to testify about his alleged prior sexual misconduct with her; and (4) the State's evidence was insufficient to support his conviction. Of these four issues, we find the first issue to be meritorious. We therefore reverse Gonzalez-Sandoval's conviction, vacate his sentence, and remand the case for a new trial.

D.H., a 10-year-old female, and J.G., a 9-year-old male, were friends. Sometimes J.G. would invite D.H. to go swimming at the local public pool. Gonzalez-Sandoval, who was J.G.'s 41-year-old father, would then drive D.H. and J.G. to the pool.

Once at the pool, D.H., J.G., and Gonzalez-Sandoval would play a game called "sharks." This game consisted of one person pretending to be a shark. The shark's goal was to catch the other people by grabbing them for several seconds. When Gonzalez-Sandoval was the shark, he would typically grab D.H. and J.G around the chest, hold them for several seconds, and then release them. The person who was caught by the shark became the new shark, and the game started over again.

3

On Sunday, May 4, 2014, D.H. played shark with J.G. and Gonzalez-Sandoval. Jordan Sosa was the lifeguard on duty that day. D.H., J.G., and Gonzalez-Sandoval were the only people in the pool. After they finished swimming, Gonzalez-Sandoval took D.H. home as usual.

On May 7, 2014, while at school, D.H.'s friend, a female student, told D.H about problems that she had been experiencing at home. The friend told D.H. that she could not "hang out" with her father anymore because he was doing inappropriate things of a sexual nature with her. D.H. came home from school and told C.H., her father, about what her friend had been experiencing. C.H. then asked D.H. if anything like what had happened to her friend had ever happened to her. D.H. responded, "Well, kinda [*sic*]." C.H. asked D.H. what she meant. D.H. told her father that Gonzalez-Sandoval had placed his hand down her swim-shorts and touched her "private parts" while playing sharks that past Sunday.

C.H. contacted D.H.'s mother, M.H. He told her that she needed to speak with D.H. C.H. and M.H. had been divorced about a year and a half at that time. C.H. also contacted Carla Fessler, who was D.H.'s school counselor. Fessler then contacted the Department for Children and Families (DCF) and the police. D.H.'s case was assigned to Detective David Holmes. Detective Holmes setup an interview for D.H. at the Child Advocacy Center (CAC). Kayla Delgado, a DCF special investigator, interviewed D.H. at the CAC. Again, D.H. alleged that Gonzalez-Sandoval put his hand down her swim-shorts while playing sharks.

After D.H.'s interview with Delgado, Detective Holmes interviewed Gonzalez-Sandoval at the police station. Gonzalez-Sandoval voluntarily came to the police station. During the interview, Gonzalez-Sandoval adamantly denied that he did anything inappropriate with D.H. while playing sharks.

4

The State charged Gonzalez-Sandoval with one count of aggravated indecent liberties with a child, an off-grid person felony in violation of K.S.A. 2015 Supp. 21-5506(b)(3)(A).

*Preliminary Hearing*

At Gonzalez-Sandoval's preliminary hearing, C.H., D.H., and Detective Holmes testified on behalf of the State. During D.H.'s testimony, D.H. testified that when she swims, including the last time she went swimming with J.G. and Gonzalez-Sandoval, she wears underwear, swim-shorts, and a long t-shirt. D.H. testified that her long t-shirt goes over her shorts. D.H. further testified that when Gonzalez-Sandoval put his hand down her swim-shorts, he also put his hand under her underwear and "inside the line" of her "private parts."

Gonzalez-Sandoval did not present any evidence at his preliminary hearing. The trial court bound Gonzalez-Sandoval over on the one count of aggravated indecent liberties with D.H.

*Pretrial Motions*

Following the preliminary hearing, the State moved to admit evidence of Gonzalez-Sandoval's prior sexual misconduct under K.S.A. 2015 Supp. 60-455(d). During D.H.'s interview with Delgado, D.H. had stated that Gonzalez-Sandoval put his hand down her swim-shorts on two or three other occasions while playing shark at the pool. The State wanted D.H. to be able to testify about the alleged earlier incidences of inappropriate touching. The State argued that this evidence should be admitted to establish Gonzalez-Sandoval's propensity to commit sex crimes against D.H. The State further argued that because Gonzalez-Sandoval mentioned during his police interview

5

that if he ever touched D.H.'s genitals, it was an accident, the evidence should also be admitted to establish absence of mistake.

The trial court held a hearing on the State's motion. At the hearing, the State reiterated the arguments within its written motion. Gonzalez-Sandoval countered that the trial court should not allow this statement into evidence because it was very prejudicial, not probative, and highly disputed. Gonzalez-Sandoval emphasized that D.H.'s statements about the alleged prior inappropriate contacts were very vague.

The trial court decided to allow D.H. to testify about the alleged prior sexual misconduct. The trial court concluded that although the statement was prejudicial and highly disputed, the evidence was relevant as to Gonzalez-Sandoval's propensity to commit the crime and absence of mistake.

*Jury Selection*

Gonzalez-Sandoval's jury trial was held on May 18 and 19, 2015. Laura Miser and Amy Aranda represented the State. Vernon Buck represented Gonzalez-Sandoval.

When jury selection began, there were three potential Hispanic jurors: T.R., K.M.S., and V., a venire member known only by her last name, which began with the letter V. V. was immediately dismissed for cause because she asserted that she had been a victim of a sex crime and could not be fair and impartial. Miser, who conducted voir dire, had limited interaction with venire members T.R. and K.M.S. When Miser asked T.R. whether people can remember events that are significant more clearly than normal with the passage of time, T.R. responded, "Yes." Moreover, when Miser asked the venire members whether anyone swam in swim-shorts and a t-shirt as opposed to a typical swimsuit, T.R. responded that she swims in a t-shirt and K.M.S. responded that she swims in swim-shorts and a t-shirt. At another point, T.R. tried to answer a question

6

about working with children in an official capacity, but the trial court told her she could not answer that question given that Miser had directed the question to other venire members. The preceding is the extent of Miser's interaction with T.R. and K.M.S. Neither T.R. nor K.M.S. responded to Buck's questions.

Later, Miser asked if any of the venire members had "been a witness, such as . . . questioned during an investigation or you had to appear in court as a witness on a sex crime case?" Nobody responded to this question. Then, Miser asked, "Has anybody been a witness, just in any kind of case where you had to answer questions to a law enforcement officer?" T.R. did not respond to this question.

During jury selection, Miser used a peremptory challenge against venire member T.R. Citing *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), Buck requested that Miser provide explanation why she was using a challenge against T.R. The trial court asked Miser for her response. Then, the following exchanged occurred:

> "MS. MISER: Yes, Your Honor. As far as Juror [T.R.], Your Honor, the State put questions to the jury about whether they had been a witness in a case or whether they had been questioned by the police involved in any way. [T.R.] was a witness in Arzate, an endorsed—we believe she was an endorsed witness in the Arzate case and had questions asked of her. We also have her in an investigation about her son where she was questioned some in her—her son-in-law, I'm sorry Judge, about the use of her own personal cell phone. And so we have knowledge of her, but she did not respond to our questions in regards to whether she'd been questioned before or a potential witness, either answering questions of law enforcement. Also, she avoided a lot of eye contact, Your Honor. Noticing that she was looking away a lot of times, especially in questions that I felt perhaps should have elicited a response, and both of the times that she was a witness—or questioned about being involved in allegations.

> "THE COURT: Mr. Buck, any comments?

7

"MR. BUCK: Well, I don't think that looking away is a good enough reason to strike someone of the same culture or ethnic heritage of the defendant. I don't know what the Arzate case is or what that involves, but it doesn't sound like she's done anything except maybe not being as cooperative as the State had hoped in an investigation. It has nothing to do with this. I don't think it qualifies as legitimate reasons for the *Batson* decision.

"THE COURT: Let me note for the record that it would—that based upon the surnames that [T.R.] does appear to be of the same ethnicity as the defendant. The State's principal challenge here to this individual that I would consider to be a racially-neutral challenge would be information—that it had information as to this individual that she did not disclose in response to direct questions and should have disclosed. That was one of those questions being whether she had been questioned or involved with prior investigations or other investigations. I'm not sure that, standing alone, the question of whether a potential juror avoids eye contact would be a basis—a racially-neutral basis, but the indication that the witness was not being truthful in her response, in my opinion, or at least candid in her response would, in my opinion, be a racially-neutral response. And so, I'll therefore allow the peremptory challenge over the defense's objection."

Miser additionally used a peremptory challenge against venire member K.M.S. Again, Buck lodged a *Batson* challenge. Then, the following exchange occurred:

"MS. MISER: Judge, in seeing [K.M.S.] today, it seemed that maybe that would just be a surname. It does not appear that she is of a Hispanic culture. I'm not sure.

"THE COURT: I cannot tell. K.M.S. [has] a hyphenated surname. I cannot tell just from observation what her ethnicity would be, but I think I'll just error on the side of caution and ask the State to express a racially-neutral reason for her selection.

"MS. MISER: May I have a moment to review her questionnaire?

"THE COURT: You may.
"(Thereupon, an off-the-record discussion was had, after which the following proceedings were had:)

8

"MS. MISER: Your Honor, the—I understand the Court's ruling, but the State would reassert again that there's no—from [K.M.S.'s] appearance here today, other than a hyphenated name, no indication that she would be of Hispanic nature; however, with the Court's ruling, what the State would submit is that this has been a bit of a long discourse this morning with potential jurors, watched their reactions, and while [K.M.S.] was on the—she was here on the front row of the gallery where I could clearly see her, at some point in time—although, I—she remained alert and attentive for the most part, it seems sometimes she may—just based upon my watching and responses to the questions, she didn't respond very much to any of the questions. Now, I understand she may not have any answers, but also the fact that it just sometimes didn't seem that she was engaged in the process as some of the other potential jurors.

"THE COURT: Mr. Buck, you want to make an argument here?

"MR. BUCK: Well, it seems too subjective for striking someone. I don't know what her ethnic background is. The name '[S.]' at least that portion of the surname indicates Hispanic nature of some sort. I think it's just very subjective and doesn't really qualify as a racially-neutral response.

"THE COURT: I'm going to disallow the peremptory challenge at this point in time. I simply don't think that not engaging in responses is appropriate since we don't know or have any indication to indicate that she would have had any responses. So, the State may exercise a peremptory challenge on another juror."

Buck lodged no other *Batson* challenges. The 12-person jury was selected. Then, the court held a recess for lunch. After this recess, the following exchange occurred out of the presence of the jury:

"THE COURT: Let the record reflect that we're reconvening out of the presence of the jury panel this morning—this afternoon, I guess it is now. Ms. Miser, I understand that you have something that you'd like to take up out of the presence of the jury?

9

"MS. MISER: Yes, Your Honor. I need to make sure I clarify for the Court in regards to the juror—Prospective Juror [T.R.]. The State had indicated to the Court that we had two cases where she had been involved as a witness and had been questioned regarding those. If the Court would recall, the State moved to strike her based upon—and provided that reason for striking her based upon her non-response to certain questions regarding being a witness.

"Ms. Aranda had double-checked those cases and it was actually indicated in one case, which would have been the Arzate case, that it was a different [T.R.]. Our notes that we had from the investigator had the wrong [T.R.]. However, her involvement in the second case that we indicated to the Court, regarding her son-in-law being questioned about the phone, that was the correct information that we provided to the Court. She still had been involved as a witness, had to answer questions, but did not respond to the State when I had asked about anyone's involvement as a witness or anyone being questioned by the police. So, we wanted to make sure we brought that to the Court's attention.

"THE COURT: Mr. Buck, I take it your objection would remain the same?

"MR. BUCK: Well, Your Honor, I didn't realize the State's questions extends simply to a police officer stopping someone on the street and asking questions about it. I thought it was more of an informal setting than what was stated.

"THE COURT: I understand. My ruling will remain the same."

Accordingly, Gonzalez-Sandoval's jury trial began. On the second day of trial, however, the State brought up T.R. again, which resulted in the following exchange between Aranda, Buck, and the trial court:

"MS. ARANDA: Judge, I just had one thing that I wanted to bring up with the Court and I know that yesterday during the voir dire and peremptory challenges, Mr. Buck lodged a *Batson* challenge to one of the jurors that we I believe it was Juror [T.R.] was her name. I had a hand in giving Mrs. Miser some information that she advised the Court was incorrect, and I just wanted to be candid with the Court and let he Court know that I did

10

go back downstairs and check to make sure. I did also talk with Ms. Miser and she advised me that she advised the Court that the notes that we had from investigations regarding Juror [T.R.] were incorrect as listing her as a witness in the Arzate case.

"Ms. Miser indicated that she advised the Court after the lunch recess that the second case involving the cell phone, that that was correct; however, I had not been up there yet to advise her that that was probably her sister and not Juror [T.R.] that was on the cell phone, so I wanted to be candid with the Court and counsel, let everybody know that we were mistaken about her on that case as well. However, we did—I did see reference in our Spillman Police System to her being named a witness in that system in a 2011 investigation of several auto—I believe they were auto burglaries. They're listed in there as non-force, non-residential burglaries, which leads me to believe that they were auto burglaries, and then there was a connected sex offense case. She was also listed as a victim on a criminal damage to property case in that system. So, just so that counsel and the Court is aware of that information. I don't want anybody misled and I wanted to be candid that we had some misinformation when we lodged or attempted to lodge our race-neutral grounds for the *Batson* challenge.

"THE COURT: So, if I understand what you're telling me is, the two instances that you gave me as being the racially-neutral reason—

"MS. ARANDA: Correct.

"THE COURT: —did not turn out to be true, but in the investigation, you found at least one and possibly two other instances that she should have disclosed in response to a question?

"MS. ARANDA: I believe so, correct.

"THE COURT: Okay. All right. Mr. Buck, I assume you want to keep your challenge in place under—even under these circumstances?

"MR. BUCK: Yes, Your Honor. We keep getting farther and farther away from the reasons that she was challenged in the first place. Now, we go back to 2011. How far

11

back do we go, simply that, we don't know the substance of and who's to say that this is something that she should have disclosed. I would like a continuing objection to it.

"THE COURT: All right. I think the question was broad enough that it would have required a response to something occurring in 2011. I don't think that's so far back that a witness would have completely forgotten about—or a juror would have forgotten about involvement or being identified in that respect; therefore, I'll continue the same ruling, but note and appreciate the candor of counsel. I think counsel honestly believed what they represented to the Court, it just turned out to be incorrect."

*Jury Trial—The State's Case*

At trial, the State presented testimony from the following people: C.H., M.H., Fessler, Delgado, Sosa, Detective Holmes, and D.H.

C.H. testified that when he and M.H. were married, they used to be neighbors with Gonzalez-Sandoval, which is how D.H. and J.G. became friends. In regards to the event in question, C.H. explained that D.H. had a good friend from school who could no longer see her father anymore because he was saying and doing inappropriate things. According to C.H., on May 7, 2014, when he picked D.H. up from school, D.H. brought up the problems her friend was having with her father. C.H. was unsure exactly what the father had done to D.H.'s friend.

C.H. testified that after D.H. told him about her friend's problems, he asked her "[h]ad that ever happened to her?" C.H. testified that D.H. responded, "Well, kinda [*sic*]." C.H. testified that when he asked D.H. what that meant, D.H. responded that Gonzalez-Sandoval had put his hand down her swim-shorts and touched her "private zone" while they were playing sharks at the pool. C.H. testified that when he asked D.H. how long Gonzalez-Sandoval had his hand in her swim-shorts, she told him 3 minutes. C.H. further

12

testified that after D.H. told him this, he took her to a local restaurant for ice cream to see if he could learn more information.

C.H. testified that he did not want to press the issue too hard because he believed that D.H. may be more comfortable talking to her mother since she was female. C.H. explained that he immediately called M.H. and told her what D.H. had told him. He encouraged M.H. "to spend time together [with D.H.] in case there were details about what [D.H.] told [him] . . .  she wasn't comfortable telling [him]." C.H. also explained that he called Fessler the next day, told her what had happened, and she reported D.H.'s allegations to the police.

M.H. testified that D.H. and J.G. went swimming together many times for about 2 1/2 years. M.H. testified that D.H. never told her that she did not want to go swimming with J.G. anymore. M.H. testified that she remembered D.H. going swimming with J.G. and Gonzalez-Sandoval on May 4, 2014. She testified that she believed D.H. came home a little later than normal, but D.H. was otherwise acting normally. M.H. further testified that she had no idea anything was wrong until she received a phone call from C.H. the evening of May 7, 2014. M.H. explained that after she got home from work later that day, she went over to C.H.'s place to pick D.H. up. M.H. explained that she took D.H. to Taco Bell, and D.H. and M.H. "picnicked in the car and talked a little bit and [she] asked her [more] questions . . . ."

When asked about the nature of her and D.H.'s conversation, M.H. testified:

"Just essentially trying to get information without being too pushy. I've never been
through this kind of situation before, so I wasn't real sure the right way to go about it, but
we just wanted to make sure we were both on the same page and understand what
happened to her, and just kind of asked a lot of questions.
. . . .

13

"I had just asked her—and I wanted to take that opportunity as girls talking to get some information on exactly what happened and where she was touched. And so, I asked her specific questions leading to, can you tell me, you know—don't show me, but can you tell me where you felt pressure or that you were touched. Do you feel that—did it feel like, um, [Gonzalez-Sandoval's] fingers went inside you. And she responded, she thought, maybe, yes."

M.H. testified that D.H. told her that he touched her private areas for maybe 3 or 5 minutes. M.H. testified that to D.H., "private area" means her vagina. M.H. also testified that when she asked D.H. if Gonzalez-Sandoval said anything to her while he touched her, D.H. told her that he did not say anything to her but was speaking to J.G. in Spanish.

When asked how their conversation ended, M.H. testified that she thought she "ended up crying" with D.H. consoling her. M.H. explained that she "let [D.H.] know that [she and C.H.] love her so much and that this [was] not her fault and that [she and C.H.] . . . would be coming together to make a plan to help her through this."

Fessler testified about her conversations with D.H. as her school counselor. Fessler testified that D.H. came to talk to her after her parents got divorced. Fessler testified that D.H. was having a hard time with her parents' divorce. Fessler explained that D.H.'s father had called her and asked her to speak to D.H. because he believed she had been touched inappropriately by a friend's father. Fessler explained that she pulled D.H. out of her classroom to talk. Fessler testified that D.H. immediately asked, "Have you talked to my dad?" Fessler testified that she stated, "Yes." In response, Fessler testified that she stated, "I'm, sorry that it happened to you, can you tell me what—can you tell me about it? And she told me the story." Fessler testified that D.H. told her that Gonzalez-Sandoval put "his hands down into . . . the bottom of her swimming suit" while playing a game at the pool. Fessler also testified that D.H. seemed nervous and "was worried because she knew that . . . it made her mom and dad sad, but she was, [] relieved that she could share

14

it with them." Fessler testified that she told D.H. that she was "really proud of her, that it was really hard to share things like that."

Delgado testified that she interviewed D.H. at the CAC on May 14, 2014. Delgado testified that the interview was video recorded. The State moved to admit a redacted version of the recorded interview into evidence. The recorded interview was admitted into evidence without objection and played before the jury. The recorded interview was not included in the record on appeal. Delgado did not testify about what was said during the interview.

Detective Holmes testified about his interview with Gonzalez-Sandoval at the police station. Detective Holmes testified that when asked for an interview, Gonzalez-Sandoval voluntarily came down to the police station. Detective Holmes testified that Gonzalez-Sandoval never denied playing sharks on the date in question, but he adamantly denied that he touched D.H. inappropriately. Moreover, Detective Holmes testified that at one point he questioned Gonzalez-Sandoval if it was possible that he had accidentally touched D.H. inappropriately. According to Detective Holmes, Gonzalez-Sandoval responded that "if it would have happened, it would have been an accident, but it hadn't happened." Later, on cross-examination, Detective Holmes admitted that he asked Gonzalez-Sandoval about anything happening "accidently" as an "interview tactic."

Sosa testified that she has been a lifeguard at the pool for nearly 4 years. Sosa testified that Gonzalez-Sandoval was a regular pool customer. Sosa recalled being the lifeguard on-duty on the day Gonzalez-Sandoval allegedly touched D.H. She testified that on that day, Gonzalez-Sandoval had "his son and another young female with him," arriving after she was already on duty. Sosa recalled that she watched them from the lifeguard stand and that they were the only people in the pool. Sosa explained that she was trained to remain focused on the people in the pool. Sosa testified that she kept her eyes trained on them the whole time that they were in the pool.

15

Sosa recalled that the three of them, Gonzalez-Sandoval, his son, and the young female, were playing a game of chase or tag in the pool. Sosa explained that it seemed that one person was "it," that there were designated bases where you could not get tagged, and that the goal was to swim from one base to another base without getting tagged by the person that was "it." Regarding Gonzalez-Sandoval, Sosa explained that "he was it at one point and I saw him, [ ] wrap his arms around the young woman and, [ ] but I would say it was no longer than 15 seconds and I think he was maybe it a couple of times, and then he let the other two play as well." Sosa explained that Gonzalez-Sandoval grabbed his son in the same manner that he grabbed the young female.

Sosa testified that when Gonzalez-Sandoval would wrap his arms around his son or the young girl it was kind of like a hug around the waist. Sosa testified that this was the only way Gonzalez-Sandoval grabbed the young girl, and Gonzalez-Sandoval's hands never moved anywhere else. Sosa explained that once Gonzalez-Sandoval would grab his son or the young girl and held them for about 15 seconds, he would let them go. Sosa testified that Gonzalez-Sandoval caught the young girl no more than two times, both times being in the manner she described. Sosa testified that she remembered the young girl was wearing a t-shirt and shorts, as opposed to a swimming suit. Sosa testified that she never saw Gonzalez-Sandoval put his hand down the young girl's swim-shorts. Moreover, she testified that she believed she would have been able to see this, if it had occurred, based on her vantage point, on the fact they were swimming in the shallow end of the pool, and on the clarity of the water.

Sosa admitted that she would not have been able to see what a person's hands were doing if that person had his back to her. She further admitted that sometimes the water could distort things. She explained, however, that when Gonzalez-Sandoval was grabbing the young girl, she had a side view of where his hands were located and they were located

16

in shallow water. Last, Sosa testified that Gonzalez-Sandoval, his son, and the young girl all "seemed to be having a good time" and nothing they did caused her any concern.

D.H. testified that she and J.G. were friends. D.H. testified that J.G. had invited her to go swimming many times, and sometimes she would invite J.G. to go swimming. She explained that Gonzalez-Sandoval would usually chaperone them at the swimming pool. D.H. explained that she, J.G., and Gonzalez-Sandoval would play the game "sharks." She explained that the shark would try to tag another person by grabbing that person for several seconds, but the shark was not allowed to tag a person who was at a designated base.

D.H. testified that when she goes swimming she wears underwear, swim-shorts, and a t-shirt. D.H. testified that she was wearing such an outfit the last time she went swimming with J.G. and Gonzalez-Sandoval.

D.H. testified that the last time they went swimming, while Gonzalez-Sandoval was the shark, he put his hand down her swim-shorts. D.H. testified that Gonzalez-Sandoval had grabbed her with one arm, placing that arm around her like a hug, and then used his free arm to put his hand down her swim-shorts. D.H. testified that she was facing forward, with her back to Gonzalez-Sandoval, when he did this. She stated that when Gonzalez-Sandoval touched her, he put his hand underneath her underwear, touched the front of her "private parts," and moved his hand around a little. D.H. testified that she did not remember Gonzalez-Sandoval putting his fingers "inside the crack" of her private parts. D.H. testified that her t-shirt was not floating, but on her body "like normal," and Gonzalez-Sandoval did not have to lift her shirt to get his hands underneath her underwear. D.H. testified that as Gonzalez-Sandoval touched her, he was speaking to J.G. in Spanish. D.H. testified that she was not allowed in the deep-end of the pool, so they always played the shark game in shallow water.

17

D.H. alleged that this incident was not the first time Gonzalez-Sandoval had touched her in that manner. D.H. testified that Gonzalez-Sandoval had touched her "maybe two or three times" before while swimming at the pool. She alleged that when Gonzalez-Sandoval had touched her before, he kept his hand outside her underwear and the touching lasted for a shorter time.

D.H. testified that after Gonzalez-Sandoval touched her, she told J.G. that they should probably go home. D.H. admitted that she never told anyone that Gonzalez-Sandoval had touched her until later that week when she was talking to her father. She explained that the day she spoke to her father, she had been speaking to a friend at school "who's essentially going through the same thing." When asked what her friend had experienced, she said that her friend shared a little bit of information about her father saying inappropriate things. She testified that she brought up her friend's situation to her father after he picked her up from school, at which point he asked if anything like that had ever happened to her, and she responded, "Well, kinda [*sic*]." She testified that she told her father about "the situation," remembering that her father looked "real angry."

During cross-examination, D.H. admitted that she continued to swim with J.G. and Gonzalez-Sandoval after the first two or three times Gonzalez-Sandoval touched her inappropriately. She admitted that she had never told anyone about these earlier touches when they occurred. She also testified that she did not know when those earlier touches occurred, just that they were at the pool.

Moreover, during cross-examination, regarding the touching for which Gonzalez-Sandoval was charged, D.H. testified that she was swimming to a base when Gonzalez-Sandoval grabbed her and stuck his hand down her underwear. When Buck confronted D.H. with her CAC statement that she was swimming away from a base when Gonzalez-Sandoval touched her, D.H. testified that she could not remember saying that. Then, D.H. testified that Gonzalez-Sandoval touched her private parts for "a couple of minutes."

18

Buck pressed D.H. on how long Gonzalez-Sandoval had touched her, resulting in the following exchange:

> "[Buck:] Well, do you remember telling you mother that it was at least five minutes?
> "[D.H.:] Yes, I do.
> "[Buck:] Was that accurate?
> "[D.H.:] Feels accurate.
> "[Buck:] Okay. So, it's more than just a couple of minutes?
> "[D.H.:] Well, yeah, in that area.
> "[Buck:] And, during that time, you did nothing, said nothing?
> "[D.H.:] No."

Buck also asked D.H. about the t-shirt she was wearing when Gonzalez-Sandoval allegedly touched her private parts. D.H. admitted that the t-shirt was long and went below her waist. When Buck asked how Gonzalez-Sandoval put his hand under her swim-shorts and underwear without raising her t-shirt, D.H. responded, "It didn't really seem like he had to pull my shirt much."

*Jury Trial—Gonzalez-Sandoval's Case*

J.G. testified on his father's behalf. J.G. explained that he and D.H. used to be friends. J.G. explained that sometimes he, his father, and D.H. would go swimming and play games. He testified that the last time that they all went swimming together, the only people at the pool were he, his father, D.H., and "[a] lady lifeguarder." He testified that they all started playing the game shark because D.H. wanted to play that game. He testified that usually his father was the shark. He testified that when his father would tag him or D.H., he would grab them with his arms around their chests for about 5 seconds; then, the person who got tagged became the shark. He admitted that sometimes his father might hold them for about 10 seconds. J.G. explained that his father never put his hand into D.H.'s swim-shorts because he could see everything. Moreover, they were in shallow

19

water, and he was wearing goggles so he could see when he was underwater. J.G. also testified every once in a while he saw Sosa step out of the pool area to speak to a lifeguard that was working at the pool entrance.

Gonzalez-Sandoval presented no other evidence on his behalf. During his closing, Gonzalez-Sandoval focused on Sosa's testimony and D.H.'s inconsistent statements. Gonzalez-Sandoval also asked the following question: Was it "even possible for someone to stand in a public pool with their hand down a young girl's pants in shallow [] clear water with the lifeguard on duty and not be seen by somebody?"

*Verdict*

The jury began deliberating at 3:39 p.m., on May 19, 2015. The jury returned with a guilty verdict 45 minutes later at 4:24 p.m.

*Posttrial Motions*

Following the jury verdict, Gonzalez-Sandoval moved for judgment of acquittal and moved for a new trial. In his motion for new trial, Gonzalez-Sandoval argued he was entitled to new trial for the following reasons:  (1) the trial court erred when it granted the State's motion to admit evidence of his alleged prior sexual misconduct with D.H.; (2) the trial court erred in overruling his *Batson* challenge regarding T.R.; and (3) the evidence was insufficient to support his conviction.

On the other hand, the State responded that the trial court should deny both Gonzalez-Sandoval's motion for judgment of acquittal and motion for new trial. The State asserted that sufficient evidence supported Gonzalez-Sandoval's conviction. The State asserted that Gonzalez-Sandoval's prior sexual misconduct with D.H. was admissible because it showed propensity and absence of mistake. The State further argued that even

20

if this evidence was not admissible, the admission of the evidence was harmless given the other evidence supporting Gonzalez-Sandoval's conviction. Moreover, the State asserted that the trial court correctly overruled Gonzalez-Sandoval's *Batson* challenge. Although acknowledging that its initial race-neutral reasons for the peremptory challenge were incorrect, the State maintained that the information it provided to the trial court on the second day of trial regarding venire member T.R. being in the police system as a witness of crimes was true.

Gonzalez-Sandoval also moved for a downward durational departure. Gonzalez-Sandoval requested that he be sentenced on the Kansas Sentencing Guidelines Act (KSGA) grid as opposed to the mandatory minimum 25-year prison sentence for his off-grid offense.

After Gonzalez-Sandoval filed his first motion for new trial, D.H.'s mother, M.H., completed a victim impact statement. In the victim impact statement, M.H. stated the following: "Over the past year, we have watched [D.H.] work through anxiety, fear, nightmares, even hallucinations, seeing the man who did this to her following her everywhere she goes." M.H. also stated that D.H. was having irrational thoughts, including wondering whether she or C.H. would sexually abuse her. Based on this information, Gonzalez-Sandoval filed a second motion for new trial. He argued that D.H.'s hallucinations constituted new evidence entitling him to a new trial. Gonzalez-Sandoval argued that D.H.'s hallucinations were material as her testimony was the only evidence against him and the hallucinations undermined her credibility. The State responded that D.H.'s hallucinations were not new evidence because information about her seeing Gonzalez-Sandoval on one occasion when he was not really there was included in her medical records, to which the defense had access.

*Post-Trial Motions Hearing*

The trial court held a hearing on Gonzalez-Sandoval's post-trial motions. At this hearing, Gonzalez-Sandoval called M.H. to testify about the victim impact statement she completed and the nature of D.H.'s hallucinations.

Following M.H.'s testimony, Gonzalez-Sandoval reiterated the arguments within his motions. Regarding his second new trial motion, Buck admitted that D.H.'s counseling records referenced one incident where D.H. thought she saw Gonzalez-Sandoval in another city, but the record did not contain anything "about an ongoing series of hallucinations." The State also reiterated the arguments from its written responses to Gonzalez-Sandoval's motions.

The trial court denied Gonzalez-Sandoval's motion for judgment of acquittal because in the light most favorable to the State, D.H.'s testimony alone was enough to obtain a conviction. For the same reason, the trial court denied Gonzales-Sandoval's new trial request based on the sufficiency of the evidence. The trial court denied Gonzalez-Sandoval's new trial request based on improper admission of prior sexual misconduct based on the reasons he allowed the evidence to be admitted in the first place. The trial court denied Gonzalez-Sandoval's new trial request based on *Batson* because although "[t]he State's initial reasoning apparently was in error," "that disclosure was at a later point in time when it would have been very difficult, short of just impaneling a whole new panel, to have corrected the error." The trial court also stated that it accepted the State's race-neutral explanation given on the second day of trial as valid.

Last, the trial court denied Gonzalez-Sandoval's motion for new trial based on D.H.'s hallucinations. First, the trial court stated that it hesitated to use the word "hallucinations," but there was no better word to use given that D.H. was evidently seeing

22

Gonzalez-Sandoval when he was not there and M.H. used that word in the victim impact statement. Then, the trial court determined the following:

> "[A]t the same time, [the counseling records] were available and therefore discoverable. Under these circumstances, and particularly since the so-called hallucinations relate to the individual responses to her belief that she had been the victim of a crime and not to a hallucination that would be creation of an event that's not somehow grounded in reality, [the Court] will deny that motion as well."

*Sentencing*

Next, the trial court immediately proceeded to sentencing. The trial court decided to grant Gonzalez-Sandoval's durational departure request to be sentenced on the KSGA grid despite the State's opposition. The trial court explained that it was granting this departure because of Gonzalez-Sandoval's lack of criminal history and lack of physical harm to D.H. Based on Gonzalez-Sandoval's criminal history score of "I," the trial court sentenced Gonzalez-Sandoval to 59 months' imprisonment followed by lifetime postrelease supervision.

*Did the Trial Court Err When Ruling on the* Batson *Challenge?*

Gonzalez-Sandoval argues that the trial court abused its discretion when it denied his *Batson* challenge regarding venire member T.R. Gonzalez-Sandoval argues that once the State admitted that the two race-neutral reasons it provided for striking venire member T.R. were factually incorrect, the trial court erred by allowing his case to proceed. Gonzalez-Sandoval contends that he is entitled to a new trial based on this error. The State responds that the trial court did not abuse its discretion because the final reason it provided to the court for striking venire member T.R. was race-neutral.

23

*Standard of Review*

Appellate courts engage in a three-step analysis when reviewing *Batson* challenges. Each step of the three-step analysis requires a distinct standard of review:

> "First, the party challenging the strike must make a prima facie showing that the other party exercised a peremptory challenge on the basis of race. Appellate courts utilize plenary or unlimited review over this step. [Citation omitted.]
>
> "Second, if a prima facie case is established, the burden shifts to the party exercising the strike to articulate a race-neutral reason for striking the prospective juror. This reason must be facially valid, but it does not need to be persuasive or plausible. The reason offered will be deemed race-neutral unless a discriminatory intent is inherent in the explanation. The opponent of the strike continues to bear the burden of persuasion. [Citation omitted.]
>
> "Third, the trial court must determine whether the objecting party has carried the burden of proving purposeful discrimination. This step hinges on credibility determinations. '[U]sually there is limited evidence on the issue, and the best evidence is often the demeanor of the party exercising the challenge. As such, it falls within the trial court's province to decide, and that decision is reviewed under an abuse of discretion standard.' [Citations omitted.]" *State v. Kettler*, 299 Kan. 448, 461-62, 325 P.3d 1075 (2014).

Moreover, under the third-step, courts must assess "the plausibility of that reason in light of all evidence with a bearing on it." *Miller-El v. Dretke*, 545 U.S. 231, 252, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005). In other words, courts must evaluate whether the State's given "reason is legitimate or merely a pretext for a true discriminatory motive." *State v. Pham*, 281 Kan. 1227, 1239, 136 P.3d 919 (2006). The trial court abuses its discretion under this third step "when it makes a decision that is based on an error of law or fact; or when it makes a decision that is otherwise arbitrary, fanciful, or unreasonable." *State v. Dupree*, 304 Kan. 43, 58, 371 P.3d 862 (2016).

In this case, there is no dispute that venire member T.R. is Hispanic or that Gonzalez-Sandoval met his burden of making a prima facie showing that Miser used her peremptory challenge against T.R. based on T.R.'s race or ethnicity. Instead, the dispute lies with whether the State met its burden in providing a facially valid race-neutral reason for using a peremptory challenge against T.R. under step two of the *Batson* analysis. Moreover, we must determine whether the trial court abused its discretion by finding that Gonzalez-Sandoval failed to carry his burden of proving purposeful discrimination under step three of the *Batson* analysis.

*Rights Protected*

In *Batson*, the United States Supreme Court recognized that the Equal Protection Clause guarantees defendants that the State will not exclude members of their race or ethnicity from the jury venire based on race or ethnicity:

> "Although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges 'for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried . . . the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." 476 U.S. 89.

Thus, the procedural safeguards of the three-step *Batson* test are designed not only to protect the right of defendants to be tried by a jury of their peers but also the right of venire members to serve on a jury. When the State excludes venire members based upon race or ethnicity, the State further hurts the entire community by undermining the community's confidence in the courts.

*Relevant Facts Review*

To summarize, during voir dire, Miser asked the potential jurors whether they had ever "been a witness, such as . . . questioned during an investigation or you had to appear in court as a witness on a sex crime case" or "been a witness, just in any kind of case where you had to answer questions to a law enforcement officer?" Venire member T.R. did not respond to either of those questions.

When Buck lodged a *Batson* objection against Miser's use of a peremptory challenge against T.R., Miser stated that she was using her peremptory challenge for the following reasons:

>**Reason #1**: "[T.R.] avoided a lot of eye contact." "[S]he was looking away a lot of times, especially in questions that [Miser] felt should have elicited a response . . . ."

>**Reason #2**: T.R. had been an endorsed witness in the "Arzate case and had questions asked of her," yet she did not respond to Miser's questions about being a witness.

>**Reason #3**: T.R. had been questioned during "an investigation about her son" using her "personal cell phone," yet she did not respond to Miser's questions about being a witness.

Buck then responded that he did not think Reason #1 was a "good enough reason to strike someone of the same culture or ethnic heritage of [Gonzalez-Sandoval]." In regards to Reason #2 and Reason #3, Buck argued that he did not know what the Arzate or cell phone case involved, but those reasons were not good enough either because it seemed the State was just upset T.R. did not cooperate more fully with them during those investigations, which had nothing to do with Gonzalez-Sandoval's case.

Although the trial court did not explicitly state that Gonzalez-Sandoval made a prima facie showing that Miser used her peremptory challenge based on T.R.'s race, the

trial court implicitly found that a prima facie showing had been made because it acknowledged that T.R. and Gonzalez-Sandoval were both of the same ethnicity. Moreover, after determining that T.R. and Gonzalez-Sandoval were of the same ethnicity, the trial court moved to the second and third step in the *Batson* analysis.

In addition, this prima facie showing based on race or ethnicity springs from the trial court's later statements made while denying Gonzalez-Sandoval's new trial motion, when it recollected: "[T]he State posed a peremptory challenge to an individual that would . . . appear to have been of the same ethnic background of the defendants. The State was required under those circumstances to demonstrate a racially-neutral reason for the issuance of the challenge." Although the trial court did not explicitly state that Gonzalez-Sandoval had made a prima facie showing that Miser had used her peremptory challenge based on T.R.'s race, the record indicates that trial court made this determination based on its statements.

The trial court ruled that Reasons #2 and #3 were valid race-neutral reasons to use a peremptory challenge against venire member T.R. because it "indicated that [T.R.] was not being truthful in her response . . . or at least candid in her response." Nevertheless, the trial court implicitly conceded that Miser's Reason #1—avoiding eye contact—was not race neutral when the only two reasons it accepted as valid race-neutral reasons were Miser's Reasons #2 and #3. In other words, if Miser's Reason #1 was not race-neutral, then Miser's Reason #1 was necessarily a pretext. Indeed, when Aranda told the trial court that Reason #3 was also not factually correct on the second day of trial, the trial court clearly indicated that it had found only two of the State's reasons—Reasons #2 and #3—race neutral, when it stated: "So, if I understand what you're telling me is, *the two instances that you gave me as being the racially-neutral reason*—[] did not turn out to be true . . . ." Moreover, nothing in the record suggests otherwise. After the trial court rejected Reason #1—the avoiding eye contact reason—it was never raised again by either party.

27

After the jury had been selected but before the start of the trial, Miser told the trial court that Reason #2 was factually incorrect. Miser explained that she had believed that venire member T.R. was a witness in the Arzate case based on notes of her private investigator. Yet, over the lunch break, she had learned that the witness in the Arzate case was not T.R., but another person who had the same last name as T.R. Miser then assured the trial court that Reason #3, the cell phone case, was still factually correct. She provided additional information about Reason #3 at this time also, implying that this was merely a police investigation as opposed to a case where T.R. had to testify in court.

Buck countered that the State's question about being a witness during voir dire was not so broad as to "extend[] simply to a police officer stopping someone on the street and asking questions about it." The trial court disagreed, holding that Reason #3 alone was a valid race-neutral reason.

Then, at the beginning of the second day of trial, Aranda told the trial court that Reasons #3 was factually incorrect. Aranda explained that she discovered that whoever was involved in the cell phone case was not T.R. Aranda told the trial court that the person involved in the cell phone case was "probably [T.R.'s] sister," although she provided no explanation why she believed that this person was T.R.'s sister. Then, Aranda provided the trial court with a substitute reason for using a peremptory challenge against T.R. Specifically, Aranda's substitute reason for using the peremptory challenge was as follows:

> **Reason #4**: T.R.'s name appeared in the "Spillman Police System" as witness to several 2011 auto-burglaries. The auto-burglaries had been "connected [to a] sex offense case." Moreover, T.R. was a victim in a criminal damage to property case. Therefore, T.R. had been a witness and should have answered questions about being a witness during voir dire.

28

Buck responded that "[w]e keep getting farther and farther away from the reasons that she was challenged in the first place." Buck further responded that Aranda had not explained any of the details of Reason #4 regarding T.R.'s involvement in the auto-burglaries, sex offense case, or criminal damage to property case. Buck asserted that based on the information Aranda disclosed for Reason #4, nobody could possibly know if T.R. should have responded to the questions about being a witness.

The trial court disagreed, finding that the State's question was "broad enough that it would have required a response" given T.R.'s apparent involvement in the 2011 auto-burglaries, the sex offense, and the criminal damage to property cases. Thus, on the second day of Gonzalez-Sandoval's trial, the trial court allowed the State to substitute Reason #3 for using a peremptory challenge against T.R. with Reason #4.

Later, when the trial court denied Gonzalez-Sandoval's motion for new trial based on *Batson* errors, the trial court reiterated that the State's substitute Reason #4 was a facially valid race-neutral reason. The trial court also stated that although "[t]he State's initial reasoning apparently *was in error*, . . . that disclosure was at a later point in time when it would have been *very difficult, short of just impaneling a whole new panel, to have corrected the error*." (Emphasis added.)

*The Trial Court Abused Its Discretion by Accepting Reasons #2 and #3 as Race-Neutral*

Gonzalez-Sandoval's arguments correctly focus on the trial court's decision to allow the State to substitute its race-neutral reasons for using a peremptory challenge against venire member T.R.

The State explained that Reason #2 was factually incorrect after jury selection but before the start of Gonzalez-Sandoval's trial. Then, the State explained that Reason #3 was factually incorrect on the second day of Gonzalez-Sandoval's jury trial. The trial

29

court allowed the State to provide a substitute race-neutral reason for striking venire member T.R.—Reason #4.

Turning our focus back to Gonzalez-Sandoval's arguments, we note that Gonzalez-Sandoval argues that the trial court abused its discretion when it allowed his case to proceed after the State revealed that Reasons #2 and #3 were factually incorrect. The State responds that the trial court did not abuse its discretion because its substitute Reason #4 was race-neutral. Thus, the State, like the trial court, assumes that it was allowed to give a substitute race-neutral reason once the State admitted that Reasons #2 and #3 were facially invalid. Accordingly, at the heart of Gonzalez-Sandoval's complaint is the following question: Can the State provide substitute race-neutral reasons for striking a minority venire member once its original reason failed because the reason was either facially invalid or deemed pretextual?

The answer to this question is clearly no. To begin with, it is readily apparent that the State cannot provide substitute reasons for using a peremptory challenge against a minority venire member based on the three-step *Batson* analysis. The three-part *Batson* test is as follows: (1) the party challenging the strike must make a prima facie showing that the other party made a peremptory challenge based on race; (2) following this prima facie showing, the party exercising the strike must provide a facially valid race-neutral reason for striking the prospective juror; and (3) the trial court must determine whether the objecting party has carried its burden of proving purposeful discrimination. *Kettler*, 299 Kan. at 461-62. These three steps encompass the entirety of the *Batson* challenge analysis.

Indeed, once the trial court makes a decision, the *Batson* analysis is completed. The trial court either allows the minority venire member to remain on the jury panel because the State failed to provide a facially valid race-neutral reason for its strike, or allows the minority juror to remain on the panel because the defense established that the

30

State's facially valid race-neutral reason was pretextual, or removes the minority venire member from the jury panel because the defense failed to establish that the State's facially valid race-neutral reason was pretextual.

Consequently, there is no fourth step under the *Batson* analysis where prosecutors get a "do-over" when the initial reasons they provide are deemed facially invalid or pretextual. The purpose of the second-step of *Batson* is to make the prosecutors articulate the *actual reason* why they are using a peremptory challenge against a minority venire member. The second-step is specifically designed to reduce a prosecutor's ability to fabricate a rational basis for striking the minority venire member that can pass race-neutral muster.

As applied in this case, Reasons #1, #2, and #3 were the reasons Miser provided for striking venire member T.R. The trial court determined that Reason #1—that T.R. was avoiding eye contact—was a pretext. Then the trial court found that Reasons #2 and #3 were facially valid race-neutral reasons that were also not pretextual. Thus, Reasons #2 and #3 were the race-neutral reasons that resulted in T.R.'s removal from the jury panel. Reason #4 was nothing more than afterthought, a substitute reason Miser and Aranda came up with once they realized Reasons #2 and #3 were factually incorrect and therefore facially invalid. Because Reason #4 was not the reason Miser initially used as a peremptory challenge to remove T.R. from the jury panel, Miser and Aranda cannot be excused from complying with the *Batson* test regardless of whether they could have originally struck venire member T.R. for Reason #4. We cannot endorse Miser's and Aranda's attempt to circumvent the *Batson* test in this way. As a result, we determine that the trial court violated the three-step *Batson* procedure when it allowed Miser and Aranda to substitute Reason #4 in place of Reasons #2 and #3, effectively rendering the second step of *Batson* meaningless.

31

Indeed, in *Miller-El*, the United States Supreme Court held that substitute race-neutral reasons are not allowed. In *Miller-El*, following the defense's prima facie showing that the prosecutor used a strike against a minority juror based on race, the prosecutor alleged that he used his strike because of the juror's views on the death penalty and rehabilitation. 545 U.S. at 243. Yet, the defense was able to prove that the prosecutor was mischaracterizing the juror's views on the death penalty and rehabilitation. *Miller-El*, 545 U.S. at 244. After the defense pointed out this mischaracterization, the prosecutor suddenly had a new reason why he decided to use a peremptory strike against the juror. *Miller-El*, 545 U.S. at 246. The trial court found the prosecutor's new reason for striking the juror believable, and the Fifth Circuit affirmed. *Miller-El*, 545 U.S., at 237, 245-46.

The United States Supreme Court disagreed with the lower courts. In reversing, the *Miller-El* Court explained that prosecutors must stand or fall on the initial reasons they give to the trial court for striking a minority venire member:

> "It is true that peremptories are often the subjects of instinct [citation omitted], and it can sometimes be hard to say what the reason is. But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can *and stand or fall on the plausibility of the reasons he gives*. A *Batson* challenge does not call for a mere exercise in *thinking up any rational basis*. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false. The Court of Appeals'[] and the dissent's substitution of a reason for eliminating [the juror] does nothing to satisfy the prosecutors' burden of stating a racially neutral explanation for their own actions." (Emphasis added.) 545 U.S. at 252.

Hence, *Miller-El* stands for the proposition that when prosecutors provide reasons for striking a minority juror, the prosecutors must "stand or fall on the plausibility of the reasons [they] give." 545 U.S. at 252. This means that prosecutors do not get do-overs when the first reason they provide for striking the minority venire member does not wash.

32

In turn, this means that trial courts should consider only the prosecutor's initial explanations for striking the minority venire member.

Additionally, we are guided in this inquiry by a Seventh Circuit United States Court of Appeals decision. In *United States v. Taylor*, 636 F.3d 901 (7th Cir. 2011) (*Taylor III*), it agreed with the preceding interpretation of *Miller-El.* Most significantly, in *Taylor II*, the Seventh Circuit remanded the case to the trial court for an evidentiary hearing specifically limited to questioning the prosecutor about his motivation for striking a minority juror because the trial court did not properly perform its duty under the third-step of *Batson*. *Taylor III*, 636 F.3d at 902. On remand, the trial court allowed the prosecutor to provide a substitute reason for striking the minority juror. *Taylor III*, 636 F.3d at 905. When Taylor appealed, the Seventh Circuit remanded the case again to the trial court. Nevertheless, this time the Seventh Circuit remanded the case for a new trial. The *Taylor III* court explained a new trial was required because under *Miller-El*, prosecutors must stand or fall on the initial reasons they provide to the trial court for striking a minority juror. *Taylor III*, 636 F.3d at 905-06. The prosecutor in Taylor's case was not allowed to provide substitute reasons why he decided to strike the juror after his initial reason was deemed a pretext for purposeful discrimination. *Taylor III*, 636 F.3d at 905-06.

We have difficulty in concluding, as the dissent does, that "the prosecutor's reasons for striking T.R. as a juror always remained the same, *i.e.*, T.R. did not respond to general questions about being involved as a witness in prior cases and she avoided eye contact during jury selection." Here, the dissent acknowledges that the prosecutor's questions were "general questions." We discuss in the next section of our opinion that when prosecutors ask questions of venire members that lack specificity, it creates a problem as to whether venire members are required to respond.

33

As a result, courts should not expect venire members to respond to poorly articulated and general questions, which can be interpreted in a variety of ways. This was especially true in this case where the prosecutor asked the venire members poorly articulated and general questions but expected venire member T.R. to provide a very specific response regarding events that allegedly took place outside of court. Keeping in mind that venire members are not required to volunteer information which is not specifically asked, we note that the prosecutor's general questions accentuate one of the fundamental problems surrounding the State's strike against T.R.

Turning our attention once again to the dissent's conclusion that the prosecutors' reasons for striking T.R. as a venire member always remained the same, we note that Miser's Reason #2 for striking T.R. was very specific: that T.R. should have responded to the State's general questions about being a witness *because T.R. was involved in the Arzate case*. Also, Miser's Reason #3 for striking T.R. was very specific: that T.R. should have responded to the State's general questions about being a witness *because T.R. was involved in the cell-phone case*. Finally, Aranda's Reason #4 for striking T.R. was specific: that T.R. should have responded to the State's general questions about being a witness *because T.R. was involved in an auto-burglary, sex offense, and criminal damage to property case*.

Thus, Miser's and Aranda's reasons for striking T.R. did not always remain the same. Indeed, they struck T.R. because she did not specifically respond about being a witness in the preceding *separate and distinct incidents (Reasons #2, #3, and #4) that occurred outside of court*. The outside of court event that Aranda relied on when giving Reason #4 was not the same as those relied on in Reasons #2 and #3; as a result, Reason #4 was a very specific substitute reason distinct from Reasons #2 and #3 for striking venire member T.R. As a result, the prosecutors' reasons for striking T.R. as a venire member never remained the same.

34

We also note that the dissent places a heavy reliance on the trial court's determination that Miser and Aranda were acting honestly when they provided the court with incorrect Reasons #2 and #3 and substitute Reason #4. This determination by the trial court, however, will not bear the weight of reliance which the dissent places upon it. Citing to *Pham* and *Kettler*, the dissent emphasizes that this court must defer to the trial court's credibility findings regarding the demeanor of the prosecutor giving a reason for striking a minority venire member. Then, the dissent states: "The trial court personally observed the prosecutor's demeanor during the hearing on the *Batson* challenge involving T.R., including the prosecutor's subsequent corrections of the record, and found no discriminatory intent or motive by the prosecutor." Undeniably, we should defer to the trial court's credibility determinations regarding a prosecutor's demeanor *during the third step of Batson*. In fact, when the *Pham* and *Kettler* courts held that this court should defer to the trial court's credibility findings, they did so in describing this court's review of the trial court's findings under *Batson*'s third step. *Kettler*, 299 Kan. at 462; *Pham*, 281 Kan. at 1237. Also, both *Pham* and *Kettler* involved situations where the trial court adhered to *Batson*'s three-step analysis.

In this case, unlike *Pham* and *Kettler*, the trial court did not adhere to *Batson*'s three-step analysis. Instead, the credibility determinations that the dissent wishes us to defer to occurred after the completion of *Batson*'s three-step analysis. In short, when Aranda admitted to the trial court that Reason #3 was incorrect and provided the trial court with the substituted Reason #4, the trial court's window for making a credibility determination had long passed.

Turning our attention once again to the facts of this case, we note that when Miser and Aranda revealed to the trial court that Reasons #2 and #3 were factually incorrect, Miser and Aranda brought the case back to the second-step of the *Batson* analysis. By acknowledging that both Reasons #2 and #3 were factually incorrect, they implicitly conceded that the reasons they provided for striking venire member T.R. were facially

35

invalid. At that point, the trial court had no choice but to declare a mistrial because the only evidence before it was that Gonzalez-Sandoval had established a prima facie showing of discrimination and that the State had provided only facially invalid reasons for its strike of T.R. Miser and Aranda were limited to the initial reasons they provided for striking venire member T.R. immediately after Gonzalez-Sandoval made his prima facie showing of discrimination. Miser and Aranda did not have the luxury of providing the trial court with substitute Reason #4. Moreover, Miser and Aranda had to stand and fall on the initial reasons they gave for striking T.R. Additionally, because T.R. had already been removed from Gonzalez-Sandoval's jury, there was no way for the State to salvage Gonzalez-Sandoval's trial. Indeed, when the State had T.R. struck from Gonzalez-Sandoval's jury panel, it violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

In summary, Gonzalez-Sandoval has correctly argued that the trial court abused its discretion when it allowed his trial to continue after it learned that both Reason #2 – that T.R. was a witness in the Arzate case—and Reason #3—that T.R. was a witness in the cell phone case—were factually incorrect and therefore facially invalid. Once the State admitted that it had not provided a facially valid race-neutral reason for striking venire member T.R., the only evidence before the trial court was that Gonzalez-Sandoval had made a prima facie showing that the State had used its peremptory challenge against T.R. based on T.R.'s race or ethnicity. There is no such thing as substitute race-neutral reasons for striking a minority venire member under the three-step *Batson* analysis. The fact the State admitted that it had made mistakes in its research does nothing to change this result. With only Gonzalez-Sandoval's prima facie showing of discrimination before it, the trial court had no option but to declare a mistrial. Because the trial court abused its discretion by not declaring a mistrial at that juncture, we reverse and remand for a new trial.

Finally, we have difficulty in concluding, as the dissent does, that we make an incorrect statement of law when we hold that prosecutors must stand or fall on the initial

36

explanations they provide for striking minority venire members. The dissent further concludes that the correct statement of law in this case is as follows:

> "The trial court is not 'barred from considering' a substitute reason for striking a minority venire member if the court finds that the prosecutor's initial reason is insufficient, but the fact that the prosecutor is offering a substitute reason is a circumstance that the trial court should consider in assessing 'the plausibility of that reason in light of all evidence with a bearing on it.'"

We note that the dissenting opinion's conclusion, however, is devoid of authority. Our research has revealed no support for this conclusion. A trial court's finding that the State's reason for striking a minority venire member is "insufficient" necessarily means that reason is facially invalid or pretextual in the context of *Batson* analysis. Moreover, the dissenting opinion's conclusion is at variance with the holdings of *Miller-El* and *Taylor III*.

In regards to *Miller-El*, the dissent attempts to minimize the *Miller-El* holding by arguing that the *Miller-El* court never held "that a prosecutor must stand or fall on the plausibility of the *initial* reasons he or she gives for striking a minority venire member." The dissent continues by asserting the following: (1) that "*Miller-El* does not prohibit a prosecutor from substituting a race-neutral reason for striking a minority juror if the court finds that the prosecutor's initial reason is insufficient"; and (2) that "[i]nstead, *Miller-El* holds that the trial court and the appellate courts cannot substitute their own race-neutral reasons to justify the prosecutor's peremptory challenge after the courts determine that the prosecutor's reasoning is not sufficiently race-neutral." *Miller-El* certainly holds that courts cannot substitute a prosecutor's given race-neutral reasons with its own race-neutral reasons. Nevertheless, the dissenting opinion ignores the language preceding that holding, which states: "[W]hen illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of

the reasons he gives. A *Batson* challenge does not call for a mere exercise in thinking up any rational basis." 545 U.S. at 252.

From this language, it is clear that the *Miller-El* Court held that prosecutors must stand or fall on the plausibility of the race-neutral reasons they stated in the first instance; that is, prosecutors cannot later provide substitute reasons for striking a minority venire member. The phrase "stand or fall" following the *Miller-El* Court's direction to prosecutors to state their reasons for striking the minority venire member, establishes the finality of the analysis. The expression "stand or fall" is an idiom, indicating that a person will either succeed or fail based on a singular event. Here, the singular event is the plausibility of the reason prosecutors give for striking the minority venire member. Once that plausibility is determined by the trial court, the prosecutors will either succeed—meaning the reason is deemed race-neutral—or the prosecutors will fail—meaning the reason is deemed facially invalid or pretextual. When the prosecutors' reasons fail, this failure is complete and final.

Moreover, the language concerning *Batson* challenges not being "a mere exercise in thinking up any rational basis" confirms that the *Miller-El* Court was unequivocally denouncing giving prosecutors' second-chance opportunities to provide race-neutral reasons for striking a minority venire member. 545 U.S. at 252. This phrase emphasizes that *Batson*'s second-step exists for prosecutors to provide *the actual reason* why they are striking the minority venire member. Clearly, a prosecutor's second, third, or fourth attempts at coming up with a race-neutral reason for striking a minority venire member would be nothing more than "a mere exercise in thinking up any rational basis." In summary, despite the dissenting opinion's argument to the contrary, it is readily apparent that the *Miller-El* Court held that prosecutors must stand or fall on the initial explanations they provide for striking a minority venire member.

In regards to *Taylor III*, the dissent asserts that *Taylor III* is factually distinguishable from this case because *Taylor III* involved a remand to the trial court and this case does not involve a remand from an appellate court. The dissent is correct. In *Taylor*, the substituted reason for striking the minority venire member was made by the prosecutor on remand from the appellate court. In this case, the dissent correctly states that no remand occurred here. Nevertheless, this is a distinction without a difference. Whether the substituted reasons for striking a minority venire member occurs on remand from an appellate court or while the trial is still in process is irrelevant.

Indeed, the moment a prosecutor offers a reason as race-neutral, the prosecutor's role in *Batson*'s three-step analysis is complete. It is then up to the trial court to rule on the plausibility of the reason given by the prosecutor. If for some reason the prosecutor's reason turns out to be facially invalid or is deemed pretextual, the prosecutor does not get a do-over at providing another reason for the strike. Then, at the moment of the trial court's ruling, the trial court's role in the *Batson* three-step analysis is complete. Thus, if the prosecutor provides a substitute reason *and* the trial court accepts that substitute reason as race-neutral, it does not matter if the prosecutor offered the substitute reason seconds after the trial court's ruling rejecting the initial reason, after jury selection but before trial started, after trial started but before a verdict, or after remand from appeal. In each circumstance, the result is the same—a violation of both defendant's and minority venire member's rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Here, as in *Taylor III*, when the violation became apparent, the violation could not be corrected because the jury had already been impaneled without the minority venire member who was improperly struck. Thus, as the trial court implicitly conceded and succinctly stated, when denying Gonzalez-Sandoval's motion for new trial, the only way "to have corrected the error" would have been to impanel "a whole new panel." On this record, the trial court's statement was correct.

*The Method Used by the State to Strike T.R. as a Venire Member Raises Serious Questions of Procedural Fairness*

Last, we must note that the record reveals that the State used an investigator to look into the background of the minority venire member, T.R. The record does not indicate whether only T.R.'s background was investigated, or whether the backgrounds of only minority venire members were investigated, or whether the backgrounds of all venire members—both minority and nonminority members—were investigated. This is an important question. For example, if the backgrounds of only minority venire members were investigated, there would be no way to compare the similarities and differences between the two groups: minority and nonminority. This means that minority venire members could be excluded for something in their background which also existed in the background of nonminority venire members. This situation would obviously be unfair and a denial of equal protection to defendants and to minority venire members.

Next, if the State has information about a minority venire member and contemplates using a peremptory strike against that venire member based on that information, it should challenge the minority venire member with that information during voir dire absent a compelling reason not to do so. Had the State challenged T.R. with its misinformation about T.R.—concerning Reasons #2 and #3—it would have learned that those reasons were invalid. Moreover, even if Reasons #2 and #3 were valid, it would have allowed Gonzalez-Sandoval's attorney to ask nonminority venire members, who did not initially respond to the State's general voir dire questions either, whether they had a similar experience as T.R. regarding the State's voir dire questions. Moreover, if they did and the State tried to exclude T.R. from the jury, Gonzalez-Sandoval's attorney could argue that the State's reasons were pretextual because nonminority venire members had a similar experience as T.R. and they were not excluded.

Turning once again to the State's voir dire questions, which the State maintains that T.R. should have responded to, they read as follows: "Has anybody been a witness, just in any kind of case, where you had to answer questions to a law enforcement officer? Anyone witness, answered questions, been involved in a case as a potential witness?" First, we note the State's questions were very general and not clearly articulated. For example: Did the State mean that venire members were only required to respond (1) if they had been involved in a case where they were questioned by law enforcement or (2) if they had been a witness in case as a potential witness (3) or both. Moreover, what kind of case is the State talking about: civil, criminal, or traffic to name a few?

The dissent notes that five other venire members responded to Miser's general voir dire question about being a witness. The dissent goes on to say that T.R. did not respond to this general question. Although five venire members responded to these question, two of the venire members simply said "yes," which Miser accepted without asking in what capacity they had been witnesses, one venire member seemed to be saying that he had been a witness in some capacity in a vandalism case, one venire member stated "I testified in a criminal case," and the remaining venire member stated "I've answered question for an investigation." Outside of the venire member who had testified in a criminal case, the venire members' responses were broad and ambiguous. Those broad and ambiguous responses stress the broad and ambiguous nature of Miser's questions in the first place.

Furthermore, caselaw is full of examples of voir dire questions that courts have determined to be ambiguous or to be of such a poor quality as to not require a response from jurors who are later claimed to have withheld vital information. Here, even if Reasons #2 and #3 were valid, the State's failure to articulate its general questions in a clear and precise way would have likely caused T.R. or any other venire member not to respond to the State's questions. See, for example, *United States v. Estey*, 595 F.3d 836, 841 (8th Cir.), *cert. denied* 560 U.S. 933 (2010) (A "defendant is not entitled to a new

41

trial when any problem with a juror's answer during voir dire was caused by the poor quality of the question asked."). Likewise, the State should not be allowed to exclude a minority venire member from a jury for failing to respond to such poorly worded questions.

Last, we note that the dissent neglects to acknowledge that of the three reasons the State used to strike T.R., two of those reasons (Reasons #2 and #3) turned out to be incorrect. This leads us to ask the following question: How do we know that the State's substituted Reason #4 was not incorrect, also? The only answer is that we will never know because the State never challenged T.R. during voir dire with any information about being a witness. And obviously, if Reason #4 was also incorrect, T.R. would have never had a reason to respond to Miser's general question about being a witness. This vividly illustrates the problem that results when the State has bogus information about a venire member and refuses to challenge the venire member with this information during voir dire.

In conclusion, if the information that the State had about T.R. was not significant enough for the State to ask about it during voir dire, the State had no basis for later arguing that she should be excluded from the jury because she failed to respond to the State's faulty information. Moreover, venire members are not required to volunteer information that is not specifically requested. As a result, a party has no basis to complain if a venire member fails to disclose information about a matter to which the party neglects to specifically inquire. See, for example, *Lopez v. State*, 105 Nev. 68, 89-90, 769 P.2d 1276 (1989) (Defendant was not entitled to a new trial based on the failure of two jurors to disclose that they had been victims of sexual abuse in response to the court's inquiry regarding whether *any juror* had been a *victim of any crime* because counsel could have followed up by asking specific questions about sexual abuse.). Here, the State failed to confront T.R. with any of the faulty information it had about her. Instead, the State chose to ambush T.R. with this faulty information after voir dire without ever

42

giving her an opportunity to correct this misinformation. Thus, the State's failure in challenging T.R. with this information should have resulted in a waiver. In other words, the State should have been precluded from using this information to exclude T.R. from the jury.

*Did the Trial Court Err by Admitting Gonzalez-Sandoval's Alleged Prior Sexual Misconduct With D.H. Into Evidence Under K.S.A. 2015 Supp. 60-455(d)?*

Next, Gonzalez-Sandoval argues that the trial court erred when it allowed D.H. to testify at trial that he touched her inappropriately on two or three other occasions. Gonzalez-Sandoval does not contest that those alleged touches constituted prior sexual misconduct evidence under K.S.A. 2015 Supp. 60-455(d). Instead, Gonzalez-Sandoval argues that any probative value of the evidence was outweighed by the undue prejudice of the evidence given that "[t]here was no evidence when the prior act[s] had occurred, who was around when the prior act[s] occurred, or any other circumstances surrounding the act[s]." The State counters that the trial court properly admitted the evidence because it was relevant in establishing Gonzalez-Sandoval's propensity to commit the crime charged as well as absence of mistake.

*Standard of Review*

Appellate courts review a trial court's decision to admit evidence in two steps:

"First, the appellate court determines whether the evidence is relevant. [Citation omitted.] Evidence is relevant if it has a 'tendency in reason to prove any material fact.' K.S.A. 60-401(b). 'Relevance is established by a material or logical connection between the asserted facts and the inference or result they are intended to establish.' [Citation omitted.] Relevant evidence is both: (1) material, *i.e.* the fact has a legitimate and effective bearing on the decision of the case and is in dispute; and (2) probative, *i.e.* has '"any tendency in

reason to prove"' the fact. [Citation omitted.] Materiality is reviewed de novo, while probativity is reviewed for abuse of discretion. [Citation omitted.]

> "If the evidence is relevant, the court next applies the statutory provisions governing admission and exclusion of evidence. [Citation omitted.] 'These rules are applied either as a matter of law or in the exercise of the district court's discretion, depending on the rule in question.' [Citation omitted.] Whether the probative value of otherwise relevant evidence outweighs its potential for undue prejudice is reviewed for abuse of discretion. [Citations omitted.]" *State v. Bowen*, 299 Kan. 339, 348, 323 P.3d 853 (2014).

An abuse of discretion occurs when the trial court makes an error of law, an error of fact, or reaches a decision that no reasonable person would reach. *Bowen*, 299 Kan. at 348.

Moreover, while debate exists, for the time being our Supreme Court has continued to require the trial court to balance the probative value of the evidence in question against the prejudicial value of the evidence in question when considering evidence admitted under K.S.A. 2015 Supp. 60-455(d). See *State v. Prine*, 297 Kan. 460, 472, 303 P.3d 662 (2013) (holding that the court would "leave the question of whether the necessity of this weighing persists under new [K.S.A. 60-455(d)] to another day"); see also *Bowen*, 299 Kan. at 350 (where our Supreme Court engaged in the balancing test when analyzing the admission of evidence under new K.S.A. 60-455[d]).

*K.S.A. 60-455*

In 2009, the Kansas Legislature amended K.S.A. 60-455. K.S.A. 2015 Supp. 60-455(d) now provides in relevant part:

> "Except as provided in K.S.A. 60-445, and amendments thereto, in a criminal action in which the defendant is accused of a sex offense under . . . articles 54, 55 or 56 of chapter 21 of the Kansas Statutes Annotated, or K.S.A. 2015 Supp. 21-6104, 21-6325, 21-6326 or

44

21-6419 through 21-6422, and amendments thereto, evidence of the defendant's commission of another act or offense of sexual misconduct is admissible, and *may be considered for its bearing on any matter to which it is relevant and probative*." (Emphasis added.)

*Propensity*

Gonzalez-Sandoval was charged with aggravated indecent liberties in violation of K.S.A. 2015 Supp. 21-5506(b)(3)(A). Therefore, he constituted a defendant accused of a sex offense which fell under K.S.A. 2015 Supp. 60-455(d).

When analyzing K.S.A. 2015 Supp. 60-455(d), our Supreme Court explained that the broad language in the provision allows the State to admit evidence of the defendant's prior sexual misconduct to show that defendant's propensity to commit the crime charged. *Prine*, 297 Kan. at 479. Our Supreme has explained that "[i]n sex offense cases, propensity evidence is material, *i.e.*, has a 'legitimate and effective bearing' on defendants' guilt." *Bowen*, 299 Kan. at 349. Clearly, evidence that Gonzalez-Sandoval touched D.H. on earlier occasions supports that he touched her on the occasion charged. Thus, the evidence of Gonzalez-Sandoval's alleged prior sexual misconduct helped establish that Gonzalez-Sandoval had a propensity for touching D.H. inappropriately. Because this evidence spoke to Gonzalez-Sandoval's propensity to commit the crime charged, the evidence was material.

Additionally, despite Gonzalez-Sandoval's complaints about D.H.'s allegations of prior sexual misconduct not being probative because the allegations of prior sexual misconduct differed too much from the crime for which he was charged, D.H.'s allegations were probative. Regarding the instances of alleged prior sexual misconduct, D.H. asserted that before the final instance of inappropriate touching, Gonzalez-Sandoval put his hand down her swim-shorts and touched her private parts on two or three

45

occasions while playing shark. D.H. asserted that during those two or three prior occasions, Gonzalez-Sandoval kept his hand outside of her underwear, as opposed to underneath her underwear, and kept his hand down her swim-shorts for a short time, as opposed to multiple minutes. Thus, Gonzalez-Sandoval is correct in that the alleged prior instances of sexual misconduct differ in some respects from the crime for which he is charged. Nevertheless, those alleged prior instances of sexual misconduct occurred at the same place, during the same game, and against the same victim. Consequently, D.H.'s allegations were highly probative because her allegations tended to establish that Gonzalez-Sandoval had committed the crime charged.

Last, the trial court did not abuse its discretion when it found that the probative value of the evidence outweighed the threat of prejudice. When evaluating whether the probative value of propensity evidence is outweighed by the potential for prejudice, appellate courts must consider the following:

> "'1) how clearly the prior act has been proved; 2) how probative the evidence is of the material fact it is admitted to prove; 3) how seriously disputed the material fact is; and 4) whether the government can avail itself of any less prejudicial evidence.'" *Bowen*, 299 Kan. at 350 (quoting *United States v. Benally*, 500 F.3d 1085, 1090-91 [10th Cir. 2007]).

In his brief, Gonzalez-Sandoval seems to focus on the first factor listed—how clearly the alleged prior acts of sexual misconduct had been proved. Gonzalez-Sandoval insinuates that if those alleged prior acts of sexual misconduct occurred, D.H. would have told someone about the misconduct when the misconduct occurred. Gonzalez-Sandoval emphasizes that the only evidence supporting that those alleged prior acts of sexual misconduct occurred was D.H.'s testimony. Yet, D.H. could not remember certain important facts about those prior acts, like when they occurred and who was present.

Still, as the State argues in its brief, D.H. remembered other things about those alleged prior acts, like that they occurred at the pool, they occurred while playing shark, and Gonzalez-Sandoval committed them by putting his hand under her swim-shorts but over her underwear. Thus, although D.H. could not recall some important details regarding the alleged prior sexual misconduct, she could remember some details clearly. Moreover, in the past, our Supreme Court has allowed evidence of prior uncharged sexual misconduct into evidence based on the alleged victim's statements alone.

For instance, in *Prine*, the trial court allowed evidence of Prine's prior sexual misconduct with J.S. and S.M. based on their statements that he had sexually abused them in the past. Although the trial court admitted this evidence under the wrong basis, the *Prine* court held this error was harmless because J.S.'s and S.M.'s allegations could have come into evidence under K.S.A. 2009 Supp. 60-455(d) to show Prine's propensity to commit sex crimes against children. 297 Kan. at 481. Our Supreme Court came to the same conclusion regarding the admission of prior uncharged sexual misconduct in *State v. Spear*, 297 Kan. 780, 788-89, 304 P.3d 1246 (2013); a case where the trial court allowed the victim to testify about prior uncharged sexual conduct that she alleged Spear committed against her.

In short, given that D.H. could provide some details about the alleged prior sexual misconduct and that our Supreme Court has concluded similar evidence of prior sexual misconduct was admissible for propensity purposes under K.S.A. 2015 Supp. 60-455(d), the trial court acted reasonably when it found that D.H.'s statements provided sufficient evidence to support the allegations of prior sexual misconduct. In turn, the trial court did not abuse its discretion by rejecting Gonzalez-Sandoval's argument that the vagueness of D.H.'s allegations of prior sexual misconduct was so prejudicial as to outweigh the probative value of the propensity evidence.

47

*Absence of Mistake*

As a final note, the trial court found that the allegations of Gonzalez-Sandoval's alleged prior sexual misconduct were admissible under K.S.A. 2015 Supp. 60-455 as evidence of propensity *and evidence of absence of mistake*. In doing so, the trial court merely stated that it was allowing the evidence in under K.S.A. 60-455, without any particular reference to a subsection of the statute.

K.S.A. 2015 Supp. 60-455(b) states: "Subject to K.S.A. 60-445 and 60-448, and amendments thereto, such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." In its brief, the State urges this court to find that the trial court properly admitted the evidence of prior sexual misconduct as evidence supporting that Gonzalez-Sandoval could not have mistakenly placed his hand underneath D.H.'s underwear for the crime charged. Gonzalez-Sandoval mentions that the trial court allowed the evidence to establish absence of mistake in passing. He otherwise includes no argument on the appropriateness of this finding. Issues not briefed are deemed waived and abandoned. *State v. Williams*, 303 Kan. 750, 758, 368 P.3d 1065 (2016).

All the same, we cannot endorse the State's absence of mistake argument. For evidence to be relevant in establishing absence of mistake, the defendant must allege that whatever happened, happened because of a mistake. *Prine*, 297 Kan. at 464. Mistake must be part of the defendant's defense. *Prine*, 297 Kan. at 464. The State asserts that in his interview with Detective Holmes, Gonzalez-Sandoval told Detective Holmes that if he touched D.H. inappropriately, it happened because of a mistake. The State asserts that D.H.'s statement to Detective Holmes allowed the admission of the evidence to establish absence of mistake.

48

Yet, this is plainly incorrect for two reasons. First, Gonzalez-Sandoval's theory at trial was not that he put his hand into D.H.'s swim-shorts and underneath her underwear by mistake. To the contrary, his theory was that he did not touch D.H. inappropriately ever. As a result, regardless of what was said in the interview with Detective Holmes, the trial court should not have allowed Gonzalez-Sandoval's alleged prior acts of sexual misconduct into evidence to show absence of mistake.

Second, the State has twisted Gonzalez-Sandoval's statement to Detective Holmes. According to Detective Holmes, after he asked Gonzalez-Sandoval if he could have touched D.H. on accident, Gonzalez-Sandoval told him that "if it would have happened, it would have been an accident, but it hadn't happened." Therefore, Gonzalez-Sandoval did not come up with some story about how he could have accidently touched D.H. Instead, when Detective Holmes asked him a question about whether he could have touched D.H. accidently, a question Detective Holmes even admitted was designed to get Gonzalez-Sandoval to admit some guilt, Gonzalez-Sandoval stated that if anything happened "it would have been an accident, *but it hadn't happened*." (Emphasis added.) As a result, there was no basis for the State to argue that Gonzalez-Sandoval alleged mistake in the interview.

*Was Gonzalez-Sandoval's Conviction Supported by Sufficient Evidence?*

Next, Gonzalez-Sandoval argues that there was insufficient evidence to support his conviction of aggravated indecent liberties with a child. Gonzalez-Sandoval emphasizes the weaknesses in the State's evidence like the fact that D.H. did not immediately tell anyone that he had touched her, the fact that D.H. made several inconsistent statement, the fact that no other evidence supported D.H.'s allegations, and the fact that J.G.'s and Sosa's testimony contradicted D.H.'s allegations. The State responds that D.H.'s testimony alone was sufficient to support Gonzalez-Sandoval's conviction.

49

*Standard of Review*

When a defendant challenges the sufficiency of the evidence, appellate courts review all the evidence in the light most favorable to the State. *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015). Generally, appellate courts will not reweigh the evidence or the credibility of witnesses. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016). Appellate courts will uphold the defendant's conviction so long as a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *Laborde*, 303 Kan. at 6. Appellate courts will reverse the defendant's conviction in only the rarest cases. See *Daws*, 303 Kan. at 785. Moreover, the defendant's conviction may be upheld even if it is supported by circumstantial evidence alone. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016).

*Sufficient Evidence Supported Gonzalez-Sandoval's Conviction*

Here, D.H. made inconsistent statements while testifying. For instance, at trial, D.H. stated that Gonzalez-Sandoval touched her for "a couple of minutes" and then decided that it must have been at least 5 minutes. Her father testified that D.H. told him that Gonzalez-Sandoval had touched her for 3 minutes, while her mother testified that D.H. told her that Gonzalez-Sandoval had touched her for 3 to 5 minutes. Moreover, some of D.H.'s testimony seemed implausible. For example, it seems unlikely that an adult male would be able to place his hand down a young girl's swim-shorts in the shallow end of a public pool for 2, 3, or 5 minutes without being noticed by his son or the lifeguard. It also seems unlikely, if not impossible, that Gonzalez-Sandoval was able to place his hand down D.H.'s swim-shorts without pulling up D.H.'s long t-shirt, as D.H. testified.

Nonetheless, D.H. did testify that Gonzalez-Sandoval put his hand down her swim-shorts and under her underwear while they were playing sharks. The jury was in the position to assess D.H.'s demeanor and weigh whether D.H.'s statements seemed credible. Given that the jury convicted Gonzalez-Sandoval, it is readily apparent that the jury found D.H.'s testimony credible. One can only speculate that the jury determined that D.H.'s inconsistent statements were based on the fact that she was a child, and therefore, she likely had a weak grasp of time and may have forgotten some of the finer details of what occurred. Additionally, as the State points out in its brief, J.G. testified that there were times when Sosa would step out of the pool area to speak to another lifeguard who was working the pool entrance. Thus, it was possible that Gonzalez-Sandoval put his hand under D.H.'s swim-shorts while Sosa went to speak to the other lifeguard. This would account for Sosa's testimony that she never witnessed Gonzalez-Sandoval touch D.H. inappropriately.

Because D.H. testified that Gonzalez-Sandoval placed his hand down her swim-shorts and under her underwear while swimming at the pool, there was evidence supporting that Gonzalez-Sandoval committed aggravated indecent liberties with D.H. Based on our standard, in the light most favorable to the State, sufficient evidence supported Gonzalez-Sandoval's conviction.

Last, because we have granted a new trial on the *Batson* challenge, it is not necessary for us to address whether the trial court erred in denying Gonzalez-Sandoval's motion for new trial based on newly discovered evidence.

Conviction reversed, sentence vacated, and case remanded for a new trial.

* * *

51

MALONE, C.J., dissenting:  I respectfully dissent from the majority's conclusion that the trial court committed reversible error in overruling Jose Alberto Gonzalez-Sandoval's *Batson* challenge. See *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). Specifically, I believe that the majority's conclusion that the State "must stand or fall on the initial reasons" it provides for striking a minority venire member and that "the trial court is barred from considering" a substitute reason is an incorrect statement of the law. Moreover, that is not what happened in Gonzalez-Sandoval's case.

Briefly summarized, the record establishes that when Gonzalez-Sandoval objected to the State's peremptory challenge of T.R., the prosecutor explained that T.R. had failed to respond to general questions about whether she had ever been involved as a witness in prior cases even though the prosecutor was aware that T.R. had been involved as a witness in two prior cases. One of the cases was referred to as the "Arzate case," while the other case involved T.R.'s son-in-law being questioned about a cell phone. The prosecutor also explained that T.R. avoided a lot of eye contact and she was looking away a lot of times while the prospective jurors were being questioned.

The trial court ruled that T.R.'s failure to maintain eye contact, standing alone, would not be a sufficiently race-neutral basis to excuse her as a juror. However, the trial court ruled that the fact that T.R. did not disclose that she had been questioned by the police or involved with prior investigations, when apparently she had been involved as a witness in prior cases, was a racially neutral response. Thus, the trial court allowed the State's peremptory challenge over Gonzalez-Sandoval's objection.

After the jury was selected and the parties returned from lunch, one of the prosecutors asked for permission to make a record outside the presence of the jury. The prosecutor explained that of the two prior cases she believed T.R. had been involved in as a witness, one of the cases, referred to as the "Arzate case," did not actually involve T.R.

52

However, the prosecutor explained that the information about the second case was correct. After hearing this information, Gonzalez-Sandoval renewed his objection to the peremptory challenge, but the trial court indicated its ruling would remain the same.

Then, on the second day of trial, one of the prosecutors again asked for permission to make a record outside the presence of the jury. The prosecutor explained, in the interest of complete candor to the court, that she subsequently had learned that the information about T.R. being involved as a witness in the cell phone case also was mistaken. However, the prosecutor indicated that police records showed that T.R. had been named as a witness in a 2011 investigation of several auto burglaries. Also, records showed that T.R. had been listed as a victim on a criminal damage to property case that was in the system. Thus, the prosecutor indicated that although she had been mistaken about the facts of the specific cases, T.R. had been involved as a witness in prior cases but she did not respond to general questions on the subject during voir dire.

Gonzalez-Sandoval renewed his objection to the peremptory challenge. However, the trial court ruled that the prosecutor's questions during jury selection were broad enough to have required a response from T.R. about her involvement in the prior cases. The trial court expressed appreciation for counsel's candor in correcting the record. The trial court specifically found that the prosecutors had "honestly believed what they represented to the court, it just turned out to be incorrect." Thus, the trial court overruled Gonzalez-Sandoval's objection to the peremptory challenge.

On appeal, Gonzalez-Sandoval argues that the trial court "erred by overruling [his] *Batson* challenge to the State's peremptory challenge of [T.R.] when the State acknowledged that the initial reason given was inaccurate." As the majority correctly states, appellate courts engage in a three-step analysis when reviewing *Batson* challenges:

53

"First, the party challenging the strike must make a prima facie showing that the other party exercised a peremptory challenge on the basis of race. Appellate courts utilize plenary or unlimited review over this step. [Citation omitted.]

"Second, if a prima facie case is established, the burden shifts to the party exercising the strike to articulate a race-neutral reason for striking the prospective juror. This reason must be facially valid, but it does not need to be persuasive or plausible. The reason offered will be deemed race-neutral unless a discriminatory intent is inherent in the explanation. The opponent of the strike continues to bear the burden of persuasion. [Citation omitted.]

"Third, the trial court must determine whether the objecting party has carried the burden of proving purposeful discrimination. This step hinges on credibility determinations. '[U]sually there is limited evidence on the issue, and the best evidence is often the demeanor of the party exercising the challenge. As such, it falls within the trial court's province to decide, and that decision is reviewed under an abuse of discretion standard.' [Citations omitted.]" *State v. Kettler*, 299 Kan. 448, 461-62, 325 P.3d 1075 (2014).

As a preliminary matter, the record reflects that the trial court skipped the first step of the *Batson* analysis and immediately turned to the prosecutor's reasons for exercising a peremptory challenge against T.R. as soon as Gonzalez-Sandoval objected. Gonzalez-Sandoval made no attempt to make a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race, and the district court made no finding that a prima facie case had been established. Without a finding that Gonzalez-Sandoval had made a prima facie showing that the peremptory challenge was based on race, the trial court should not have required the prosecutor to offer a race-neutral reason for striking T.R. Nevertheless, the State did not object to the trial court's procedure and makes no argument on appeal that Gonzalez-Sandoval failed to make a prima facie case.

Also, as a preliminary matter, the majority opinion states that the trial court found that the prosecutor's explanation about T.R. avoiding eye contact was "a pretext." The record does not support this statement. The trial court never used the word "pretext" and

never found the reason was pretextual. Such a finding would imply that the trial court believed the prosecutor was providing a phony reason for striking T.R. when the real reason was based on race. Instead, the court merely stated that T.R.'s failure to maintain eye contact, standing alone, would not be a sufficient basis to excuse her as a juror.

Turning to the issue before the court, the majority opinion relies on *Miller-El v. Dretke*, 545 U.S. 231, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005), in finding that the trial court committed reversible error in overruling Gonzalez-Sandoval's *Batson* challenge. In that case, Miller-El and his accomplices allegedly shot and killed a hotel employee and severely injured another during an attempted robbery. During jury selection at the capital murder trial, the prosecution used peremptory strikes against 10 of the 11 black panelists. Miller-El objected, claiming that the strikes were based on race, especially considering the Dallas County District Attorney's office's history of excluding black jury members. The trial court heard evidence of the alleged discriminatory practices but found no symptomatic exclusion of blacks as a matter of policy. The trial court denied Miller-El's request for a new jury, and the trial resulted in a conviction and death sentence for capital murder.

Miller-El subsequently filed a petition for habeas relief under 28 U.S.C. § 2254, and he reasserted his claim about the jury selection. The district court and the 5th Circuit Court of Appeals denied Miller-El any relief. On review by the United States Supreme Court, the Court ultimately found, by clear and convincing evidence, five discriminatory practices that supported Miller-El's claim: (1) The striking of black venire members for reasons equally applicable to nonblack venire members who were selected, 545 U.S. at 252; (2) "shuffling" black venire members, 545 U.S. at 254-55; (3) using a graphic description of the death penalty for black venire members but giving a bland description to nonblack venire members, 545 U.S. at 255-56; (4) asking how low of a sentence was appropriate for murder but only informing nonblack panelists of Texas' 5-year mandatory

minimum, 545 U.S. at 261-63; and (5) the Dallas County DA's office's use of a jury selection manual encouraging the exclusion of minority jurors. 545 U.S. at 266.

As part of its extensive discussion of Miller-El's claim, the Court addressed the fact that the lower courts had sustained the prosecution's actions as nondiscriminatory by substituting their own race-neutral explanations for why the prosecution exercised its peremptory challenges. The Court rejected this practice as improper and stated:

> "It is true that peremptories are often the subjects of instinct [citation omitted], and it can sometimes be hard to say what the reason is. But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can *and stand or fall on the plausibility of the reasons he gives*. A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade *because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false. The Court of Appeals'*[] *and the dissent's substitution of a reason for eliminating* [*the juror*] *does nothing to satisfy the prosecutors' burden of stating a racially neutral explanation for their own actions*." (Emphasis added.) 545 U.S. at 252.

Returning to Gonzalez-Sandoval's case, the majority states that *Miller-El* stands for the proposition "that prosecutors do not get do-overs when the first reason they provide for striking the minority venire member does not wash. In turn, this means that trial courts should consider only the prosecutor's initial explanations for striking the minority venire member." I believe the majority has read too much into the holding in *Miller-El*. It is true that *Miller-El* states that a prosecutor must "stand or fall" on the plausibility of the reasons he or she gives for striking a minority venire member. 545 U.S. at 252. But the opinion does not say that a prosecutor must stand or fall on the plausibility of the *initial* reasons he or she gives for striking a minority venire member. The opinion in *Miller-El* does not prohibit a prosecutor from substituting a race-neutral reason for striking a minority juror if the court finds that the prosecutor's initial reason is

56

insufficient. Instead, *Miller-El* holds that the trial court and the appellate courts cannot substitute their own race-neutral reasons to justify the prosecutor's peremptory challenge after the courts determine that the prosecutor's reasoning is not sufficiently race-neutral.

The majority opinion also cites *United States v. Taylor*, 636 F.3d 901 (7th Cir. 2011). In that case, Taylor and his accomplice were tried for murder and armed robbery for their involvement in the fatal shooting of a gun store owner in Indiana. Although it was not clear which of the two defendants was the shooter, the government sought the death penalty for both. During jury selection, the prosecution used peremptory strikes to exclude five African-American members of the panel, including W. During voir dire, W. had stated that she would be reluctant to impose the death penalty on a nonshooter, but she also stated that she would follow the law as instructed. Following a *Batson* challenge, the prosecutor explained that he removed W. because she was reluctant about the death penalty. The district court denied the *Batson* challenge but did not make any specific findings about the use of the peremptory strike against W. Both defendants were convicted and sentenced to life imprisonment.

The 7th Circuit Court of Appeals remanded for a hearing because the district court provided no credibility determination as to why the prosecutor would excuse an African-American juror based on her answers to the nonshooter question, but would not excuse a similarly situated white juror for the same reason. 636 F.3d at 903. However, at the remand hearing, the prosecutor advanced seven new reasons for why the government used a peremptory strike against W., including some of W.'s answers on her juror questionnaire and her statements in voir dire that she favored looser gun control laws. The district court determined that some of the government's new reasons were race-neutral and once again denied the *Batson* challenge.

On a subsequent appeal, the 7th Circuit reversed the district court's ruling and held that when a case is remanded for the district court to make specific findings on the

prosecutor's use of a peremptory strike against a minority juror, the court should have limited its inquiry to the reason the government originally had offered at trial for the peremptory strike. *Taylor*, 636 F.3d at 905-06. *Taylor* is factually distinguishable from Gonzalez-Sandoval's case. In *Taylor*, the appellate court remanded a case for the district court to make credibility findings as to the specific reason the prosecutor had given for striking a minority juror, but instead the court allowed the government to offer seven new reasons for making the peremptory strike. Gonzalez-Sandoval's case does not involve a remand from an appellate court, but instead the prosecutor came forward while the trial was still in process with corrected information about one of her peremptory strikes.

Returning to our case, the majority opinion concludes as a matter of law that the State "must stand or fall on the initial reasons" it provides for striking a minority venire member and that "the trial court is barred from considering" a substitute reason for striking the minority venire member. I believe this is an incorrect statement of the law. The trial court is not "barred from considering" a substitute reason for striking a minority venire member if the court finds that the prosecutor's initial reason is insufficient, but the fact that the prosecutor is offering a substitute reason is a circumstance that the trial court should consider in assessing "the plausibility of that reason in light of all evidence with a bearing on it." *Miller-El*, 545 U.S. at 252.

In any event, Gonzalez-Sandoval's case does not present a situation where the prosecutor offered a substitute reason for striking T.R. after the district court found that the prosecutor's initial reasons were not race-neutral. The prosecutor initially stated that she wanted to strike T.R. for two reasons. First, the prosecutor claimed that T.R. had been involved as a witness in two prior cases, but she did not respond to general questions on the subject during voir dire. Second, the prosecutor explained that T.R. avoided eye contact while the prospective jurors were being questioned. The trial court found that the second reason, standing alone, was not a sufficient reason to excuse T.R. from the jury, but the first reason was a racially neutral response. Later, after the jury selection was

58

completed, the prosecutor made a record that she had been mistaken about the facts of the specific cases involving T.R. The prosecutor explained that T.R. had not been involved in the two specific cases described to the court during jury selection, but police records showed that T.R. had been involved as a witness in other cases, and T.R. failed to disclose this information during general questioning by the prosecutor.

Stated differently, the prosecutor's reasons for striking T.R. as a juror always remained the same, *i.e.*, T.R. did not respond to general questions about being involved as a witness in prior cases and she avoided eye contact during jury selection. The only thing that changed was that the prosecutor came forward with corrected information about the facts of the prior cases involving T.R. The trial court found that the prosecutor's questions during jury selection were broad enough to have required a response from T.R. about her involvement in the prior cases. More importantly, the trial court specifically found that the prosecutor had honestly believed the information she previously had represented to the court. The trial court personally observed the prosecutor's demeanor during the hearing on the *Batson* challenge involving T.R., including the prosecutor's subsequent corrections of the record, and found no discriminatory intent or motive by the prosecutor. The Kansas Supreme Court has indicated that an appellate court's review of the district court's credibility determinations during a *Batson* challenge is "greatly deferential." *State v. Pham*, 281 Kan. 1227, 1237, 136 P.3d 919 (2006).

Next, the majority opinion asserts that "if the State has information about a minority venire member and contemplates using a peremptory strike against that venire member based on that information, it should challenge the minority venire member with that information during voir dire absent a compelling reason not to do so." This assertion makes sense to me, even though I would note that it is well beyond any argument that Gonzalez-Sandoval made in his appellate brief. I agree with the majority that if the State wanted to strike T.R. as a juror based on T.R.'s failure to disclose her involvement as a witness in two prior cases, the prosecutor should have questioned T.R. about her

59

involvement in the prior cases during voir dire. That way, Gonzalez-Sandoval's attorney could have asked T.R. questions about the subject and the district court would have had a better record upon which to rule on the *Batson* challenge. It seems fundamentally unfair to allow the State to strike T.R. as a juror based on her failure to disclose her involvement as a witness in prior cases when Gonzalez-Sandoval was not privy to that information during voir dire and there is nothing in the record to support the accuracy of the information. See *State v. Collins*, No. 96,393, 2007 WL 2239405, at *8-9 (Kan. App.) (unpublished opinion), *rev. denied* 285 Kan. 1175 (2007) (Malone, J., dissenting in part).

However, the Kansas Supreme Court previously has rejected a very similar argument in *State v. Harris*, 259 Kan. 689, 915 P.2d 758 (1996). In that case, the defendant was charged with first-degree murder and objected to the State's peremptory challenge of a minority juror. The State's race-neutral reason for striking the juror was that he "lied on his juror questionnaire, answering no to the question of whether he or any members of his family had been a party to any civil or criminal case." 259 Kan. at 705. The prosecutor claimed that cases had been filed against a number of the juror's immediate family, although none of this information had been elicited by the prosecutor during voir dire. The district court found that the prosecutor's reason was race-neutral, noting that both the juror and the juror's family were known to the court.

On appeal, the defendant argued "that proof should have been brought out on the record during voir dire" of the State's claimed race-neutral reason for striking the juror. 259 Kan. at 706. Our Supreme Court rejected that argument, noting the deference that is generally given to the district court's determination of a *Batson* challenge. 259 Kan. at 706. The court further acknowledged that "the better practice in this case would be for the district court to have made a record and substantiated the State's claim that the witness made a false statement rather than simply relying on its own knowledge of the persons involved." 259 Kan. at 706. Nonetheless, the court concluded that the district court's failure to make a record of the State's race-neutral reason for striking the minority juror

60

was not fatal to the peremptory challenge. 259 Kan. at 706. Thus, under *Harris*, it appears that it is not an abuse of discretion for the district court to rely on facts not presented at voir dire to determine whether the State's reason for striking a juror was race-neutral.

Finally, the majority opinion asserts that the prosecutor in Gonzalez-Sandoval's case failed to clearly articulate her questions about whether any of the prospective jurors had ever been involved as a witness in prior cases and that T.R. should not have been expected to respond "to such poorly worded questions." During voir dire, the prosecutor asked the panel whether anyone had been involved as a witness in prior cases, including the following question: "Has anybody been a witness, just in any kind of case where you had to answer questions to a law enforcement officer?" T.R. did not respond to this question, but five other prospective jurors provided information in response to the question. Later, the trial court ruled that the prosecutor's questions during voir dire were broad enough to have required a response from T.R. about her involvement in prior cases.

Whether the prosecutor sufficiently articulated her questions in voir dire to have required a response from the prospective jurors is not the key issue in resolving Gonzalez-Sandoval's *Batson* challenge. The key issue is determining whether the prosecutor engaged in purposeful discrimination by removing a prospective juror based on race. *Batson* only requires the prosecutor to articulate a race-neutral reason for striking a minority juror, it does not need to be persuasive or plausible. *Kettler*, 299 Kan. at 462. Usually there is limited evidence for the trial court to determine whether the objecting party has carried the burden of proving purposeful discrimination in a *Batson* challenge, and the best evidence to resolve the issue is often the demeanor of the prosecutor. 299 Kan. at 462. Here, the trial court personally observed the prosecutor's demeanor during the hearing on the *Batson* challenge, including the prosecutor's subsequent corrections of the record, and found no discriminatory intent or motive by the prosecutor. An appellate court should give great deference to this finding. *Pham*, 281 Kan. at 1237.

To sum up, I have concerns about how the trial court handled Gonzalez-Sandoval's *Batson* challenge involving T.R. It is unfortunate that the prosecutor initially misstated the specific facts concerning the prior cases involving T.R. It is also unfortunate that the prosecutor did not correct this information until after the jury was selected. It also seems unfair to me that the prosecutor was permitted to strike T.R. as a juror based on information that was not brought out on the record during voir dire. The State should not be allowed to use information to strike a minority venire member when the defendant does not have access to the same information.

But in the end, the prosecutor's reasons for striking T.R. as a juror always remained the same: T.R. did not respond to general questions about being involved as a witness in prior cases and she avoided eye contact during jury selection. *Batson* only requires the prosecutor to articulate a race-neutral reason for striking a minority juror, it does not need to be persuasive or plausible. *Kettler*, 299 Kan. at 462. More importantly, the trial court personally observed the prosecutor's demeanor during the hearing on the *Batson* challenge involving T.R. and found no discriminatory intent or motive by the prosecutor. An appellate court should give great deference to this finding. *Pham*, 281 Kan. at 1237. Based on the record presented in this case and Kansas precedent governing *Batson* challenges, I am unable to conclude that the trial court committed reversible error in overruling Gonzalez-Sandoval's *Batson* challenge.